UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES ROHR,

    Plaintiff,

v.                                                   Case No. 04-C-477

TODD NEHLS,

    Defendant.

## DECISION AND ORDER

This case arises out of James Rohr's demotion and subsequent failure to be promoted within the Dodge County Sheriff's Department. Rohr alleges that the sheriff, Todd Nehls, used these adverse employment actions to retaliate against him for speaking out on a matter of public concern, in violation of the First Amendment. He also asserts that he was denied procedural due process. Nehls has filed a motion for summary judgment, raising several defenses. Because each claim turns on disputed questions of material fact, however, the motion will be denied.

### I. BACKGROUND

James Rohr has been a deputy sheriff in Dodge County for roughly twenty years. In 2003, when the events underlying this lawsuit took place, he had achieved the rank of lieutenant and was in charge of the department's drug investigations unit. In 2002, Todd Nehls won a contested election for sheriff. After Nehls took office in early 2003, he instituted a number of changes and new policies. These changes included an emphasis on formality: the use of proper channels, following the chain of command, using formal complaint and booking procedures, and so-on. Nehl's, a member of the Wisconsin National Guard for 26 years, introduced the new department

policies and procedures through a Power Point Presentation. On March 3, Nehls issued a "special notice" to the department in which he announced several changes to the department. First, he announced the appointment of Lt. Trace Frost to head the criminal investigations division. In addition, Frost's duties included managing detective assignments, time sheets, overtime requests, and acting as the liaison with the district attorney's office. (Nehls Aff., Ex. 3.) The notice also indicated that only "complaints that have 'Request for Charges'" should be sent to the DA's office; this restriction was intended to curb informal deputy consultations with the DA. The notice indicated that the new procedures were not meant to inhibit interaction with the DA but only to streamline the process.

The focus of this case begins in May 2003 when the Fox Lake Fire Department responded to a call at the house of Robert Dolan and found possible explosives, fireworks and detonators. Expressing some concern about the situation, both the Fox Lake fire chief, William Frank, and the police chief, Patrick Lynch, contacted Rohr; Lynch chose Rohr as a contact person because he believed Rohr had been involved in an earlier investigation of Dolan's activities. Upon learning of the Fox Lake officers' concerns, Rohr contacted District Attorney Steve Bauer, who told Rohr to obtain evidence to support a search warrant. Rohr then directed Detective Mark Murphy to begin interviewing the firefighters who had witnessed the potentially illegal fireworks in Dolan's basement.

On May 12, two days after Rohr spoke with District Attorney Bauer, Murphy went to interview firefighters at the Fox Lake Fire Department. The same morning, the sheriff's department was investigating an unrelated homicide. Looking for a detective to staff the homicide investigation, Sheriff Nehls paged Murphy and told him that the fireworks case was closed and that

he should not have involved the sheriff's department in it in the first place. Later that morning, Nehls called Chief Lynch and told him he had closed the case. Throughout, Nehls apparently had a sanguine approach to the situation: he told Lynch that he had searched Dolan's house himself and found no illegal fireworks there. In short, in Nehls' view it was not a matter the department should have been wasting its time with.

On May 13, Nehls began an internal investigation to determine how the department had become involved in the Dolan investigation. He asked District Attorney Bauer what had occurred over the previous weekend. The same day, Nehls also solicited information through a memorandum to Rohr, Murphy and another detective. (Nelhs Aff., Ex. D.) The memo posed ten questions about how and why the department had gotten involved in the Dolan investigation: who was the complainant; was there a formal complaint; who contacted the DA; had Lt. Frost been involved; how much time had elapsed, etc. The memorandum closed by stating that its purpose was to make the department operate better; Nehls was simply trying to understand how the department had gotten involved in an investigation without either him or the chief deputy sheriff knowing anything about it. It also stated that Nehls wanted to improve communication and procedures within the department to eliminate the "informal" assistance the department was giving to other local law enforcement agencies (such as the local fire and police departments involved in the Dolan matter).

Rohr did not respond to the memo immediately. Instead, he contacted the Wisconsin Attorney General's office and inquired about the proper procedure for filing a complaint against Sheriff Nehls. Rohr was told to contact the chairman of the county board, and Rohr promptly called Board Chairman Chuck Swain on May 13 and 14. Rohr expressed his concern that Nehls may have improperly interfered in the Dolan investigation by closing it when there were grounds to believe

3

Dolan possessed illegal fireworks or other contraband. Swain told Rohr to contact the district attorney, which Rohr did on May 23.

In the meantime, on May 17, Rohr responded to Nehls' memo. He stated that as far as he knew no formal complaint had been initiated in the Dolan matter, although the Fox Lake authorities had expressed their concern and had asked Rohr "what could be done." On May 23, Rohr met with District Attorney Bauer, who told him he thought Nehls hadn't done anything improper in closing the Dolan investigation. The same day, Sheriff Nehls emailed Bauer, stating that he knew Rohr had been referred to Bauer by Board Chairman Swain. Bauer responded the same day, reiterating what he told Rohr – that the sheriff had great discretion and that he didn't see any problem with Nehls' activity.

Rohr's behavior clearly upset Sheriff Nehls. On May 28, Nehls informed Rohr that he was going to file a formal complaint against him with the County Board Personnel Committee and seek Rohr's termination. Rohr could avoid this if he would take a demotion to patrolman. Nehls gave Rohr some time to think about it, and later told Rohr that he had already talked to the committee about the situation. He may also have suggested that he would have the committee's support in seeking Rohr's termination. This news, in Rohr's version of events, prompted him to accept the voluntary demotion on June 19.

On July 29, the position of corporal opened up and Rohr applied for it. Given that he had previously been a lieutenant, Rohr was most likely the best qualified for the position in terms of experience. Nevertheless, a captain reviewing the applications (there were six) and Nehls believed Rohr had not progressed enough to receive the promotion. Thus, Rohr was passed over; he alleges

4

that his failure to receive the promotion stems from the same retaliatory motive that underlay his original demotion.[1]

## II.  ANALYSIS

**1. First Amendment Claims**

The majority of the briefs are devoted to the plaintiff's First Amendment claims. Rohr asserts that he was demoted and passed-over for subsequent promotion in retaliation for reporting Nehls to the county board chairman, which he argues was protected activity. Nehls claims that Rohr's speech was not protected because it was reckless and untruthful. He also argues that even if the speech were protected, he was entitled to punish Rohr because the speech was disruptive of the department and bad for morale. He further asserts that he would have demoted Rohr regardless of the speech. Finally, he claims he is entitled to qualified immunity. I will address each of Nehls' arguments in turn.

**A. Protection for Government Employee Speech**

Justice Holmes famously said that one has a constitutional right to talk politics, but no constitutional right to be a policeman. *McAuliffe v. Mayor of New Bedford,* 29 N.E. 517 (1892). That view has been rejected by the courts, *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 227 (2003), and it is now "well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos,* 126 S.Ct. 1951 (2006) (quoting *Connick v. Myers,* 461 U.S. 138, 142 (1983)). The prevailing doctrine attempts to achieve a balance between the speech rights of public employees

---

[1]For purposes of the present motion, I treat the failure to promote claim as essentially subsumed by the demotion claim; the issues raised by both are largely identical.

and the obvious needs of governments, as employers, to manage those employees and the matters on which they speak out. "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568 (1968).

The Seventh Circuit has set forth the framework for determining when a public employee's speech rights have been violated:

> In analyzing a First Amendment retaliation claim brought under § 1983, we apply a three-step test premised on the Supreme Court's decisions in *Pickering, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977), and *Connick v. Myers,* 461 U.S. 138 (1983). First, we must determine whether the plaintiff's speech was constitutionally protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in her termination. Third, defendants then have the opportunity to show that the plaintiff would have been fired even in the absence of the protected speech.

*Cygan v. Wisconsin Dept. of Corrections,* 388 F.3d 1092, 1098 (7th Cir. 2004). The first inquiry is multifaceted and asks, under *Connick,* whether the speech was about a matter of public concern or a complaint about a merely private matter. If the speech involves a matter of public concern, a court then must undertake the *Pickering* balancing test, "balancing the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Id.* (citing *Pickering,* 391 U.S. at 568).

**B. Rohr's speech involved a matter of public concern**

Nehls concedes that Rohr's speech touched on a matter of public concern – the sheriff's handling of a criminal investigation – but argues that Rohr's complaint to Board Chairman Swain

6

was reckless and/or untrue. If the statements were recklessly made, Rohr would not be entitled to First Amendment protection. *McGreal v. Ostrov,* 368 F.3d 657, 673 (7th Cir. 2004). In particular, Nehls asserts that Rohr, as a lieutenant with nearly twenty years of experience, should have known that there was nothing illegal or improper about Nehls calling off the Dolan investigation. Although the district attorney agreed that Nehls had not done anything improper, I conclude that Rohr's complaint to Swain was not the sort of untrue or reckless speech unworthy of the First Amendment's protection.

Nehls attempts to paint Rohr's complaint as being solely criminal in nature, i.e., that Rohr was attempting to report Nehls for criminal obstruction, in violation of Wis. Stat. § 946.41. Because Nehls' actions did not meet the elements of that crime, the argument goes, Rohr's complaint to Swain must have been untrue or reckless. Two reasons cause me to reject this argument. First, even accepting Nehls' characterization of Rohr's speech, the mere fact that Nehls' actions did not satisfy the elements of the crime of obstruction does not render Rohr's complaint itself unworthy of any First Amendment protection. In other words, the First Amendment does not protect only "correct" speech. *See Gustafson v. Jones,* 290 F.3d 895, 908 (7th Cir. 2002) (Defendants' "tentative suggestion that Gustafson and Cornejo were 'recklessly indifferent' to the accuracy of the information . . . is [not] relevant to the question whether the issue was a matter of public concern.") In the Title VII context, for example, the merits of the underlying complaint do not affect the retaliation analysis; that is, protection from retaliation exists even if the underlying complaint proves fruitless. The same is true in the First Amendment context; the question is not whether the speaker was *correct,* but simply whether the speech implicated a matter of public concern. *See, e.g., Bianchi v. City of Philadelphia* 183 F. Supp. 2d 726, 746 (E. D. Pa. 2002)

7

("Even though the harassment he experienced may have fallen outside of the protections of Title VII, Bianchi was still entitled to voice his concerns about practices within the Philadelphia Fire Department and in doing so engaged in conduct protected by the First Amendment.") Put another way, the whistleblower is protected from retaliation even if the whistle produces no sound. Thus, even if there was nothing improper about Nehls' behavior (as the district attorney opined), it does not follow that Nehls then has a free hand to retaliate against Rohr. In sum, even if I accepted Nehls' argument that Rohr's complaint was limited to the bringing of a criminal charge under Wis. Stat. § 946.41, the fact that the charge might have failed does not automatically mean the charge was reckless or untrue.

A second reason to reject Nehls' argument is that his characterization of Rohr's complaint is implausible. Although Rohr did indicate an interest in bringing a charge of criminal obstruction, it is unclear why, if that were the sole purpose of his complaint, he would speak initially to the county board chairman rather than the district attorney. Instead, the record reveals at the very least a factual dispute about the nature of Rohr's complaint. It seems more likely that if Rohr was complaining about criminal activity he was also complaining about what he viewed more generically as improper or unethical activity on the part of his boss. In essence, he wanted to alert the county board that the county sheriff had backed off a criminal investigation. Although Rohr's charge may have had a criminal component to it, the record shows that his complaint was likely much broader. Speech criticizing the sheriff's approach to the conduct of criminal investigations is clearly a matter of public concern. *Greer v. Amesqua,* 212 F.3d 358, 371 (7th Cir. 2000) ("Whether public officials are operating the government ethically and legally is a quintessential issue of public concern."); *Gustafson,* 290 F.3d at 908 ("their claim survives as long as they also

8

intended to bring to light what they believed to be the negative law enforcement consequences of the new policy.") Having found that Rohr's speech involved a matter of public concern, I will now proceed to the remainder of the *Pickering* analysis.

**C. *Pickering* balance**

The Seventh Circuit has set forth the balancing process as follows:

Under *Pickering,* we balance the employee's interest in commenting upon such matters and the employer's interest in efficient public services. One very important consideration is the "potential disruptiveness" of the speech. Courts also consider whether the employment relationship is one in which personal loyalty and confidence are necessary, and the time, place, and manner of the speech.

*Cygan,* 388 F.3d at 1101.[2] Nehls focuses on the potential disruptiveness of Rohr's speech. In particular, he notes that the employer in this case was a sheriff's department, rather than, say, a department of motor vehicles; in the law enforcement setting, he argues, obedience and loyalty are crucial to achieving the department's goals. By presenting unfounded criminal complaints to the county board chairman, Rohr's behavior could only result in the disruption of the department.[3]

---

[2]Other factors include: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Greer,* 212 F.3d at 371.

[3]Nehls asserts the disruption potential was acute in light of a county scandal a year earlier, in which a board member tried to influence the prior sheriff's investigation of a hit-and-run. The similarities are not readily apparent, however. Whereas it might be improper for a board member to use her pull to influence an ongoing investigation, there seems to be little impropriety in a sheriff's department official contacting the board chairman–especially at the behest of the Department of Justice. Moreover, the fact that one scandal had already sullied the department would seem to make it *more*, rather than *less,* important for employees to report potential wrongdoing.

Of course it is not hard to imagine that if Rohr had been lodging completely unfounded criminal complaints about his boss, such activity could have the potential to disrupt the department's functioning. But above I rejected Nehls' narrow characterization of Rohr's speech. In particular, Rohr's speech was not limited to the making of an "untrue" criminal complaint; the evidence suggests instead (especially taking it in Rohr's favor, as I must) that the nature of his complaint was much broader–Rohr simply believed it was improper for Nehls to let Dolan off the hook, and he wanted someone above Nehls to know about it. Thus, construing Rohr's complaint more broadly leads to the conclusion that he was not trying to pin a phony rap on his boss – which could obviously have been disruptive – but was simply attempting to follow what he believed were the proper channels to report inappropriate activity.

In addition, the manner in which the complaint was made also suggests its limited disruptive potential. *Greer,* 212 F.3d at 371 ("The manner and means of the employee's protestation are key considerations in balancing an employer's and employee's interests under *Pickering*.") Rohr did not call a press conference or seek to embarrass his boss in any humiliating way, nor did he spread rumors or seek to undermine his boss within the department. Instead, he called the state justice department, which referred him to the board chairman. *Cf. Greer,* 212 F.3d at 371-72 (noting that firefighter "fired off his news release.") He spoke with the board chairman in confidence, and the chairman referred him to the district attorney. At each step, then, the record shows that Rohr was seeking – and following – the advice of public officials. He was not causing chaos, inciting unrest or generating undue publicity, but rather following the process as it was laid out for him. Nehls attempts to cast these communications as severely disruptive, especially in light of a scandal the previous year involving the board and the sheriff's department. Although it is conceivable that a

10

jury could agree with him, it seems doubtful that a lieutenant's discreet communications with county officials would have the potential to meaningfully disrupt the department's functioning. Indeed, under Nehls' theory almost any attempt at whistleblowing in the law enforcement context could be grounds for firing because it would cause disruption.

Nehls analogizes this case to *Garcetti,* in which a deputy district attorney was retaliated against for his actions in a criminal proceeding. He testified at a suppression hearing and wrote a disposition memo recommending that the criminal case be dismissed. The Supreme Court found his speech not protected, however, because it arose solely from his job as a district attorney. His memo recommending dismissal, for example, was written wholly in his professional capacity; the speech was, in essence, the *employer's* own work product. "The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." 126 S. Ct. at 1960.

Thus, in *Garcetti* the Supreme Court recognized that the interest of the government *as employer* dovetails with the role of the employee *as employee*. In other words, there is a distinction between protections afforded to one's *personal* speech – as a concerned citizen, say – and the speech carried out in one's official employment role. Thus, even if the employee's speech touches on matters of public concern, "[a] government entity has broader discretion to restrict speech when it acts in its role as employer." 126 S. Ct. at 1958. This level of control over the speech of government employees recognizes the fact that "[p]ublic employees . . . often occupy trusted

11

positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.*

Nehls' analogy to *Garcetti* collapses, however, because in this case it is clear that Rohr's complaints were not made while he was acting in his official capacity. In fact, one of Nehls' criticisms is that Rohr was acting *outside* of his proper employment role when he failed to use proper channels to complain about Nehls. Rohr's complaints, though they involved his employment, were simply not the work product of the sheriff's department in the same way Ceballos' memo might have "belonged" to the district attorney's office in *Garcetti*. Instead, this case more closely resembles *Gustafson v. Jones,* in which two Milwaukee Police officers alleged the chief had meddled in their investigation. 290 F.3d 895. What *Gustafson* (which went to trial) makes clear is that disposition of this element of the *Pickering* test will be difficult on summary judgment because the employer must show definitively that the punished speech was disruptive. *Id.* at 909-910. Nehls cannot do that here. All Nehls posits are generalized notions about the need for discipline and the potential for disruption of the department's morale. By his own admission, however, Rohr's complaints were largely baseless. It is difficult, therefore, to see how they could have been unduly disruptive of the department's functioning. There remain, at the very least, substantial disputes about the potential for Rohr's statements to have been so disruptive that they were not entitled to First Amendment protection.

**D. Causation**

Of course the *Pickering* balancing analysis only helps the employee if the speech was a factor in the employer's adverse action. Nehls makes a somewhat half-hearted attempt to argue that Rohr cannot show his complaint to Swain was a factor in his demotion. He also argues that even if it was, Nehls would have demoted him anyway for other reasons. Nehls claims that Rohr's

12

performance had deteriorated, he was causing an uncomfortable work environment, and that he frequently failed to follow Nehls' policies and procedures.

In some cases the determination of causation may be made by a judge at the summary judgment stage, for example, when the plaintiff seeks to rely merely on the timing of an adverse action and *post hoc* reasoning. *Cygan,* 388 F.3d at 1102-03. In other words, when all a plaintiff has to go on is speculation about an employer's motives without any reasonable fact-driven inference of cause and effect, a court may find that the plaintiff has not created a genuine issue of material fact. In this case, however, substantial factual disputes prevent the entry of summary judgment. For instance, even according to Nehls, Rohr's speech was at the very least a "culmination point" in the decision to demote him; that is, it was material. (Nehls Aff., ¶ 9.) The laundry list Nehls now provides about deficiencies in Rohr's job performance may convince a jury that he would have been demoted regardless of his protected activity, but a jury might also reasonably conclude that such was not the case. No deputy had ever been reprimanded or demoted for violating any of the policies Nehls now cites. The timing was not just suspicious but explicitly followed not just Rohr's activities but Nehls' own attempts to get to the bottom of what Rohr had said. Moreover, a transcript of the demotion meeting between Rohr and Nehls reveals that Nehls was quite upset that Rohr had talked to the board chairman: "Well, it is a big deal when you go to the county board chairman as a management employee and question the authority of the sheriff and the actions of the sheriff twice."[4] A jury could thus conclude that Rohr's demotion was largely the result of his

---

[4]The transcript is marked Exhibit 15 but is attached as Exhibit 8 to the affidavit of Steven Porter. (Docket No. 51 at 7.)

13

communications with the county board chairman and that Rohr would not have been demoted to patrolman (or subsequently passed over for promotion) in the absence of his speech.

**E. Qualified Immunity**

Nehls also asserts that he is entitled to qualified immunity on the First Amendment claim because it was not clearly established in 2003 that a sheriff could not retaliate against an employee under facts like those at issue here. Nehls is incorrect. As the Seventh Circuit noted in *Gustafson,* "the key elements of this case have been clear for years: a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular through a transfer to a less desirable position, and speech about police protection and public safety raises a matter of public concern." 290 F.3d at 912. Nehls does not debate that the fundamental elements of a retaliation claim were clearly established in 2003. Instead, he suggests the law is not so clearly established once the fact-intensive elements of the *Pickering* balance come into play: as the *Gustafson* court noted, "there might have been a question about how clear it was that the public employer could not punish employees who exercised First Amendment rights, if the employer cited efficiency concerns as its reason." *Id.* at 913. Because Nehls cited efficiency concerns in his termination decision, he argues, Rohr's rights could not have been clearly established.

While it is true that the fact-intensive nature of the *Pickering* balance often muddies the contours of what constitutes established law, the *Gustafson* court's approach to qualified immunity does not allow an employer simply to "cite" efficiency concerns and thereby become entitled to don the cloak of immunity. Instead, the *Gustafson* court noted that context counts, and the context in that case was "whether any employer could have thought it was entitled to punish an employee for speech on a matter of public concern where the speech caused no actual disruption of any kind for

14

four months." *Id.* Similarly, the issue in this case is whether any employer could reasonably have thought it acceptable to secure the demotion of an employee – on efficiency and disruption grounds – simply for contacting the county board chairman about what the employee believed was improper conduct. As noted above, there are substantial doubts as to whether the employer could have regarded Rohr's speech as so disruptive that it was entitled to terminate or demote him.[5] Indeed, because in Nehls' view the complaint was groundless it is difficult to envision how he could have believed Rohr's limited actions as disruptive. Accordingly, summary judgment on the question of qualified immunity is denied.

**2. Due Process**

Finally, Nehls seeks summary judgment on Rohr's due process claim, which is grounded in Rohr's belief that he was coerced into accepting a demotion in the department. In order to make out a due process claim, Rohr has to assert a property interest in his employment position, a deprivation of that interest, and a failure to afford notice and an opportunity to be heard prior to the deprivation. *Dixon v. City of New Richmond,* 334 F.3d 691, 693 (7th Cir. 2003).[6]

Because Rohr chose to take a demotion, of course, the circumstances are somewhat different from the more typical case where an employee is fired or demoted. That is, if one's decision to take a demotion is voluntary, it would make little sense to require any "process" (e.g., holding a hearing)

---

[5]In addition, I have rejected Nehls' claim that he terminated Rohr because his speech was untrue or reckless. Thus, this cannot constitute a basis for qualified immunity.

[6]Nehls initially asserts there is no property interest in continued employment in the sheriff's department, but then abandons that position in his reply brief. It seems clear that a lieutenant in the sheriff's department may only be terminated or demoted for just cause, Wis. Stat. § 59.26(8)(b)(5m), a fact which creates a protected interest in continued employment absent sufficient grounds for dismissal or demotion.

15

beforehand. Nevertheless, Rohr's due process claim asserts that his decision to take the demotion was not actually voluntary. In particular, he alleges that Nehls lied to him during a June 13, 2003 telephone call. According to Rohr, Nehls said he had already spoken with the County Law Enforcement Committee – the body that would approve Rohr's termination – about the case and that the committee was on Nehls' side. (PPFOF ¶ 38.[7]) Nehls admitted that he may have falsely told Rohr that he had already spoken to the committee.[8] Thus, there is evidence that Rohr's decision to accept the demotion was based on false information, which could render it involuntary or coerced. As such, the sheriff is not insulated from a due process challenge. *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir. 1982) ("[i]f the resignation was involuntarily given . . . then plaintiff's separation from government employment constituted a discharge, and he would be entitled to certain procedural rights.")

Nehls responds by asserting that Rohr has no evidence the committee was actually stacked against him. Because Rohr is only speculating that the committee was predisposed to terminate him, the argument goes, he cannot survive summary judgment. This argument misses the mark, however, because Rohr's claim of coercion is founded in Rohr's *perception* at the time, not reality. That is, he does not claim that the committee *was* determined to terminate him, but merely that Nehls *told* him it was. Because Nehls' misrepresentations could have induced Rohr to accept a

---

[7] Rohr's deposition is attached as exhibit 20 to Docket No. 51; relevant portions include pages 106-109 and 135-136.

[8] Nehls' deposition is attached as exhibit 18 to Docket No. 51; at page 163 he states that he "may have" told Rohr he had already spoken to the committee when in fact he had not.

16

demotion, there is some evidence that the decision was coerced. Accordingly, a jury could conclude he was denied due process and summary judgment must be denied.[9]

### III. CONCLUSION

For the reasons set forth above, the motion for summary judgment is denied.[10] The clerk will set the case for a telephonic scheduling conference.

**SO ORDERED** this   11th   day of October, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

[9]Nehls also posits that because Rohr had the "opportunity" to consider his decision, he was afforded ample due process. Yet that ignores the potentially coercive nature of a decision based at least in part on false information. No amount of time to ponder a decision can render such a decision voluntary if one of the key factors in the decision is untrue.

[10]Nehls also raises an argument that the county (not named as a defendant) cannot be liable. The plaintiff appears to be relying on Wis. Stat. § 895.46 – a defense and indemnification statute – rather than making any attempt to hold the county liable for Nehls' actions, however. In any event, at issue is the defendant's own motion for summary judgment rather than any particular theories of recovery to which the plaintiff (or the defendant) might be entitled if the defendant is ultimately found liable.

17